David H. SCHOENBAUM, Plaintiff,

v.

Bradshaw D. FIRSTBROOK, Jean-Paul Legrand, Harold W. Manley, Louis Pradal, John C. Rudolph, Donald K. Russell, Gilbert Rutman, Samuel Watkin, Aquitaine Company of Canada, Ltd., Paribas Corporation of New York and Banff Oil Ltd., Defendants.

No. 66 Civ. 856.

United States District Court
S. D. New York.

March 29, 1967.

Sidney B. Silverman, New York City, for plaintiff.

Simpson, Thacher & Bartlett, New York City, for defendants Harold W. Manley, John C. Rudolph and Donald K. Russell; Whitney North Seymour, Jr., and John C. Diller, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants Aquitaine Co. of Canada, Ltd. and Louis Pradal; Marvin Schwartz, and Michael M. Maney, New York City, of counsel.

White & Case, New York City, for defendants Paribas Corp. of New York; David Hartfield, Jr., and Thomas A. Butler, New York City, of counsel.

Roth, Carlson, Kwit & Spengler, New York City, for defendant Banff Oil Ltd.; Robert S. Carlson, New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

Plaintiff, a shareholder of defendant Banff Oil Ltd. (Banff), brings this action under the Securities Act of 1933, 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et

seq. Defendants are Banff and its individual directors, Aquitaine Company of Canada, Ltd. (Aquitaine), Banff's controlling stockholder, and the Paribas Corporation of New York (Paribas). Plaintiff asserts that the use of "inside information" by the defendants in three transactions involving the sale of Banff stock violated the aforementioned Acts. Defendants, other than Banff, move for summary judgment.

The first transaction complained of is a tender offer made by Aquitaine with the approval of the Banff Board of Directors on January 15, 1964[1] to Banff shareholders for the purchase of some 1,400,000 shares of Banff common stock.

The second transaction concerns a purchase by Aquitaine of 500,000 Banff treasury shares. Plaintiff alleges that this purchase was consummated on or about March 15, 1965. Defendants assert that there was a binding contract as of January 5, 1965 when Aquitaine accepted Banff's offer to sell of December 14, 1964, and that only delivery was effected in March. We regard any discrepancy that apparently exists in this respect as of no importance for purposes of this motion.

The third transaction, taking place in late 1965 and early 1966, involved the sale of 270,000 treasury shares by Banff. Defendants allege that the purchaser was Banque de Paris et des Pays-Bas pour le Grand Duche de Luxembourg (Pays-Bas Luxembourg), a French banking firm which is not a party to this action. Defendant Paribas, a Delaware corporation with offices in New York City and a wholly owned subsidiary of Pays-Bas Luxembourg, asserts it acted solely as an agent and consultant for its parent. The complaint is unclear as to whether Paribas acted as agent or principal in the sale. (See Complaint, para. 13(b)) Plaintiff's Memorandum of Law (p. 7) clarifies this by stating that the sale was "to customers of Paribas."

The complaint charges that in all three transactions the respective purchasers defrauded their sellers in that they bought with "inside information." It alleges that for some time prior to February 6, 1965 defendants knew that Banff was developing extremely valuable oil fields in western Canada, information undisclosed to the public or to Banff shareholders, and which affected to an impressive extent the price of Banff shares. The market price of those shares has since risen considerably above the highest price paid in any of the three sales complained of.

The heart of the complaint is that the use of inside information violated section 10(b)[2] of the 1934 Act and Rule 10b–5[3] promulgated thereunder.

1. The complaint alleges the date of the Aquitaine tender offer to be January 15, 1965. However, in his Memorandum of Law, plaintiff's attorney agrees that 1964 is the correct date.

There is no allegation that Aquitaine had any control over Banff prior to the tender offer.

2. 15 U.S.C. § 78j(b) provides: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

 \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

3. 17 C.F.R. § 240.10b–5 provides: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange

 (1) To employ any device, scheme or artifice to defraud,

 (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Defendants counter that as to all three purchases there is no cause of action stated under section 10(b); that there is no subject matter jurisdiction with respect to the Aquitaine and Paribas treasury stock purchases.

### The Aquitaine Tender Offer

■ We do not find any cause of action to exist as to the Aquitaine tender offer to Banff's shareholders. The complaint alleges that plaintiff has owned his shares continuously since 1959. It does not allege that plaintiff sold any shares to Aquitaine as part of the 1964 tender offer. Accordingly, plaintiff presents no representative claim arising from that transaction.

■ In contemplation of law, the corporation does not have a claim under section 10(b). Even if control was acquired as part of a fraudulent scheme, there is no injury to the corporation within the meaning of section 10(b) upon which a derivative action can be based. Further, any damage resulting from alleged acts of corporate waste committed by those who so gained control does not constitute a cause of action under section 10(b). Hoover v. Allen, 241 F.Supp. 213, 228–229 (S.D.N.Y. 1965).

### The Aquitaine and Paribas Treasury Stock Purchases

■ Although plaintiff has termed his action representative as well as derivative, no representative claim has in fact been asserted. If the corporation has a claim under section 10(b), a shareholder has standing to sue only on a derivative basis. Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); Slavin v. Germantown Fire Ins. Co., 174 F.2d 799, 805–806 (3d Cir. 1949); Surowitz v. Hilton Hotels Corp., 342 F.2d 596, 604 (7th Cir. 1965), rec'd. on other grounds, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966).

Defendants assert defenses of lack of jurisdiction and legal insufficiency. It is advisable at this point to review the evidence submitted to this Court.

Defendants have complied with the mandate of Rule 56(e) and have adduced numerous documents in the form of affidavits and exhibits attesting to their version of the facts.

■ Plaintiff's papers consist of: (1) The verified complaint made upon information and belief. Because the complaint is verified, it will be regarded as an affidavit. However, it is clear that an affidavit made on information and belief can not support on summary judgment the averments it attempts to uphold. Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc., 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); 6 Moore, Federal Practice, ¶ 56.22 [1], p. 2806 (1965). (2) A brief affidavit in opposition by the attorney for plaintiff. (3) The Memorandum of Law submitted by the same attorney to the contents of which he refers in his affidavit as setting forth the facts. Again, these documents do not meet the standards prescribed by Rule 56(e). Certainly, statements in briefs are not considered as evidence on a summary judgment motion and do not controvert evidence submitted by the movants. Lane v. Greyhound Corp., 13 F.R.D. 178 (E.D.Ky.1952); United States v. Jones, 155 F.Supp. 52, 56 (M.D.Ga.1957); Allen v. Radio Corp. of America, 47 F. Supp. 244, 246 (D.Del.1942). Moreover, even if we were to regard the memorandum as being incorporated by reference into the attorney's affidavit, the result is an affidavit clearly made without personal knowledge and clearly insufficient. Berkley v. Clark Equipment Co., 22 F.R.D. 487 (E.D.N.Y.1958); Abel v. Morey Machinery Co., 10 F.R.D. 187 (S. D.N.Y.1950); Frost v. Bankers Commercial Corp., 11 F.R.D. 195 (S.D.N.Y.1951), aff'd sub nom. The Constellation (Frost v. Bankers Commercial Corp.), 194 F.2d 505 (2d Cir. 1952).

■ The papers thus present a situation where as to certain vital factual matters defendants have submitted impressively sound, credible evidence as against

plaintiff's barrenness. On summary judgment, as at trial, resolution of the factual contention must be made in favor of the party supporting his position with evidence.

To do otherwise would emasculate summary judgment, making it but another motion for judgment on the pleadings or to dismiss for legal insufficiency. And it is well established that on summary judgment the court is not limited to the questions raised by the pleadings, for summary judgment may be granted when the affidavits in support of the motion pierce the alleged issues of fact raised by the pleadings. 6 Moore, supra ¶ 56.11 [3], pp. 2161, 2167–68; 3 Barron & Holtzoff § 1235.1 (1958); Topp-Cola Co. v. Coca-Cola Co., 185 F.Supp. 700, 707 (S.D.N.Y. 1960); Dale Hilton, Inc. v. Triangle Publications, Inc., 27 F.R.D. 468, 470 (S.D. N.Y.1961); Dressler v. MV Sandpiper, 331 F.2d 130, 132–133 (2d Cir. 1964).

### Jurisdiction

In determining jurisdiction the Aquitaine and Paribas transactions are regarded as distinct and separate. Defendants have submitted sworn affidavits persuasively attesting to the lack of connection between the Aquitaine and Paribas stock purchases. (Rutman Affidavit, para. 9, Michel Affidavit, para. 3). The complaint makes accusations of some "conspiracy." In attempting to support this, plaintiff's attorney notes that Aquitaine and its controlling interests are French; Paribas is owned by a French bank, the stock received in the Paribas transaction was ultimately placed with ten French investors. We do not regard this as being of the stuff of which conspiracy charges are upheld. We believe summary disposition of this contention appropriate. See Scolnick v. Lefkowitz, 329 F.2d 716 (2d Cir. 1964).

### The Aquitaine-Banff Transaction: Jurisdiction

Affidavits submitted by the Presidents of Aquitaine and Banff concerning the Aquitaine-Banff transac-

tion attest: Negotiations, the exchange of offer and acceptance, and delivery of the shares occurred in Canada; payment was made in Canada and in Canadian funds; no part of the transaction occurred in the United States. (Rudolph Affidavit, para. 11; Rutman Affidavit, para. 9). Plaintiff sets forth no factual allegations that contradict that this was solely a Canadian transaction. Instead, he has denominated defendants' affidavits as "self-serving" and contends that he should test the credibility of defendants at trial. Where plaintiff has produced nothing to support the facts essential to his claim, he is not entitled to a trial solely on the issue of the credibility of defendants' witnesses. We would not, on summary judgment, resolve a genuine issue of credibility.

"But this does not mean that any plaintiff, armed with a complaint barely sufficient to survive a motion to dismiss, can force a defendant to a protracted trial merely by suggesting that the defendant's affidavits may be false. Such a rule would make a mockery of the summary judgment procedure under Rule 56. "Topp-Cola Co. v. Coca Cola Co., supra, 185 F.Supp. at 708.

We regard this most proper pronouncement as warranting the strictest applicability here. Plaintiff has charged fraud and conspiracy—charges easy to fling and possessing serious consequences for the accused. Those making such accusations should be prepared to produce evidence as to their validity.

Accordingly, the papers submitted permit no other inference than that a Canadian corporation was allegedly defrauded by its principal shareholder, also a Canadian, the fraud being executed and consummated outside of the United States. The one United States contact present is Banff's listing on the American Stock Exchange. However, the fraud alleged has nothing to do with Banff shares traded on the American Exchange. The exchange facilities were irrelevant to the transaction complained of.

■ Absent the presence of an extra-territorial function in the Exchange Act, these United States contacts are too insubstantial to warrant application of section 10(b) to this Canadian transaction. Our interpretation of the statute and its purpose as applied here make inapplicable any such extra-territorial test.

■ It is a standard canon of construction that " * * * legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States * * *. It is based on the assumption that Congress is primarily concerned with domestic conditions." Foley Bros. Inc. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949); Blackmer v. United States, 284 U.S. 421, 436–437, 52 S.Ct. 252, 76 L.Ed. 375 (1932). In the two cases where this Court has considered the extra-territorial effect of the Exchange Act, it has held that there is nothing in the statute or its legislative history suggesting that the statute was designed to apply outside the territorial jurisdiction of the United States. Ferraioli v. Cantor, CCH Fed. Sec.L.Rep. ¶ 91615 (S.D.N.Y.1965); Kook v. Crang, 182 F.Supp. 388, 390 (S.D.N.Y.1960).

The normal presumption of territoriality is reinforced by the specific mandate of section 30(b), 15 U.S. § 78dd(b), which provides:

.The provisions of this title or of any rule or regulation thereunder shall not apply to any person in so far as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this title.

This Court has previously noted in a suit brought under Rule 10–5: "Surely, if Congress intended to exempt from the Act those persons who are extra-territorially engaged in the securities business, it intended to exempt those who extra-territorially enter into a single,

isolated sale of securities." Ferraioli v. Cantor, supra at 95317.

### Choice of Law Principles

■ We recognize in choice of law principles strong reasoning why this transaction is governed by Canadian law. The complaint essentially alleges a breach of the directors' fiduciary duty—expanded to include the fiduciary obligation of a controlling shareholder and a "tippee." The determination of a director's fiduciary duty to the corporation and its shareholders is governed by the law of the state of incorporation. Hausman v. Buckley, 299 F.2d 696, 93 A.L.R. 2d 1340 (2d Cir.), cert. denied, 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962); Geller v. Transamerica Corp., 53 F.Supp. 625, 629 (D.Dela.1943) aff'd 151 F.2d 534 (3d Cir. 1945); Restatement, Conflicts of Laws §§ 187, 199 comment a (1934); Restatement 2d, Conflicts of Laws, § 187 (Tentative Draft No. 7 (as revised) April 15, 1963). The only exception to this principle that has developed are those cases which found the corporation to be foreign in name only. See Note, 108 U.Pa.L.Rev. 742, 745 (1960); Mansfield Hardwood Lumber Co. v. Johnson, 268 F.2d 317 (5th Cir.), cert. denied, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959). This factor is not present here.

■ The reason for this rule is the legitimate interest of all in the certainty of governing relationships *inter sese* of the corporation, directors and shareholders by a single law. See Reese & Kaufman, The Law Governing Corporate Affairs: Choice of Law and the Impact of Full Faith and Credit, 58 Colum.L.Rev. 1118, 1125 (1958). In this way, the reasonable expectations of the parties are protected. Directors would not suddenly find an action, executed and legal in the state of incorporation, attacked under a contrary rule of a foreign state. A shareholder, who has voluntarily invested, can reasonably be presumed to have agreed that his relationship with the corporation is governed by the laws of the state of incorporation.

Certainly, here, a shareholder in a Canadian corporation cannot be heard to complain that his company's activities in Canada are without the benefit of United States law.

We recognize that choice of law principles are not determinative as to whether Congress intended the Exchange Act to have extra-territorial effect. However, the reluctance of one state to interfere with the obligations a sister state has imposed on a corporation, its directors and shareholders, is strengthened when the problem is that of one country imposing its standards of corporate behavior on another. Cf. Steele v. Bulova Watch Co., 344 U.S. 280, 288–289, 73 S.Ct. 252, 97 L.Ed. 252 (1952). If the impact of such foreign transactions on the American securities market is of concern, the S.E.C. has power to make appropriate rules. See section 30 (b) of the Exchange Act. The failure of the S.E.C. to do so in an obvious situation is futher indication of the lack of interest by the United States in such transactions.

Plaintiff, in urging the extra-territorial application of the Exchange Act, relies upon those cases enunciating the "protective principle" of jurisdiction: "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power." Strassheim v. Daily, 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911); Ford v. United States, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927); United States v. Aluminum Company of America, 148 F.2d 416, 443 (2d Cir. 1945). Plaintiff's claim being solely derivative, any harm was to a Canadian corporation. We find no allegation of harm occurring within the United States to support the application of this principle.

Recent developments in the extra-territorial application of economic regulation statutes indicate the need for more substantial United States contacts than are here present. In Steele v. Bulova Watch Co., supra, relied upon by plaintiff, the Supreme Court found infringement of plaintiff's trademark in Mexico to constitute a claim under the Lanham Act for unfair competition. However, certain decisive factors were present in *Steele;* the equivalent is totally absent here. (1) Defendant in *Steele* was a United States citizen. (2) The components were purchased in the United States. (3) The spurious goods affected plaintiff's reputation. (4) Spurious goods filtered back into the United States. See also Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 704–705, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

In the instant case, no effects on United States commerce are alleged to have occurred. What is alleged—a fraud on a foreign corporation, by foreigners, in a foreign country—is not within the purview of the Exchange Act. Cf. Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633 (2d Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956).

### The Paribas Transaction: Jurisdiction

Defendants have submitted affidavits attesting to the Canadian nature of the Paribas-Banff treasury stock purchase: negotiations were conducted in Canada and France, the purchase was executed, payment made, and the shares delivered in Canada. (Rudolph Affidavit, paras. 17–18; Michel Affidavit, para. 3). The President of Paribas submits that Paribas acted solely as an agent for Pays-Bas Luxembourg, serving as a conduit and a consultant. (Michel Affidavit, para. 3). Defendants' papers reveal, however, that the offer was sent by Paribas from New York to Banff in Canada. (See Exhibit A to Michel Affidavit).

Plaintiff's complaint and Memorandum of Law asserts that the transaction took place in New York. (Complaint, para. 18(c); Memorandum, p. 25). In view of the principles of summary judgment discussed above, we do not regard this declaration—unsupported by any-

thing approaching evidence—as giving rise to a genuine, contested issue of fact.

■ The affidavit of plaintiff's attorney also asserts that the stock sold—allegedly a private placement with European investors—is now being traded in the United States. He submits that he has been told this by a broker. Affidavits on summary judgment must present evidence which would be admissible at trial. Instead we are offered rank hearsay; we disregard it. 6 Moore, supra, ¶ 56.22 [1], p. 2807–08; Universal Films Exchanges, Inc. v. Walter Reade, Inc., 37 F.D.R. 4, 5 (S.D.N.Y. 1965); Smerdon v. Swedish-American Line, 33 F.R.D. 314, 315 (S.D.N.Y.1963).

■ We cannot look upon this one isolated and incidental act of mailing the offer from New York to Canada as changing what again is an essentially Canadian transaction into one subject to the fraud rules of the Exchange Act. Any fraud occurred in Canada and is without effect upon the United States securities markets. Considered in context, this single use of the United States mails is insufficient a contact to subject the entire Canadian transaction to the provisions of section 10(b). See Kook v. Crang, supra, where this Court held that the margin requirements of the Exchange Act did not apply to a Canadian brokerage transaction despite the comparatively frequent use of United States mails and facilities in furtherance of a brokerage enterprise.

The cases relied upon by plaintiff presented much more substantial United States connections than here involved. In the second Ferraioli v. Cantor case, CCH Fed.Sec.L.Rep. ¶ 91,704 (S.D.N.Y. 1966) the court found that the amended complaint alleged that an integral part of the fraud was consummated in New York City. In Securities and Exchange

Commission v. Gulf Intercontinental Finance Corp., 223 F.Supp. 987 (S.D. Fla.1963) the court found the scheme there involved had been conceived and operated within the United States.

*Legal Sufficiency*

■ Plaintiff charges that the Aquitaine and Paribas purchases of Banff treasury stock was made on the basis of inside information and in violation of section 10(b) and Rule 10b–5. Imperatively resolved is the proposition that the use of inside information in certain circumstances is a fraud within the meaning of section 10(b). See Securities and Exchange Commission v. Texas Gulf Sulphur, Inc., CCH Fed.Sec. L.Rep. ¶ 91805 (S.D.N.Y.1966); Kardon v. National Gypsum Co., 73 F.Supp. 798 (E.D.Penn.1947). Equally clear it is that where the corporation has been defrauded in the issuance of its stock within the meaning of section 10(b) and Rule 10b–5, a stockholder may assert derivatively his corporation's claim. Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); New Park Mining Co. v. Cranmer, 225 F.Supp. 261 (S.D.N.Y.1968); Kane v. Central American Mining & Oil, Inc., 235 F.Supp. 559 (S.D.N.Y.1964).

The essential fact here is that plaintiff alleges, and defendants concede, that all members of Banff's Board of Directors had full knowledge of the oil drilling activities which constituted the secret inside information.[4] There is no allegation that any affirmative misrepresentations were made. It is precisely the absence of this factor which distinguishes this case from Dembitzer v. The First Republic Corp. of America, CCH Fed.Sec.L.Rep. ¶ 91,445 (S.D.N.Y.1964) and Heilbrunn v. Hanover Equities

---

4. Defendants have submitted extensive affidavits attempting to demonstrate that at the time of these transactions (which is in dispute) the drilling had not reached such a point as to provide material information. See List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). We do not regard defendants' papers as having clearly established this, and, accordingly, assume for purposes of this motion, that defendants did have material information unknown to the general public.

Corp., CCH Fed.Sec.L.Rep. ¶ 91706 (S. D.N.Y.1966), relied upon by plaintiff.

 Plaintiff is in effect urging as a principle of law that anyone buying with inside information has automatically violated Rule 10b–5. We regard this as contrary to both normal business practices and the logic of the Rule's admonition.

 The fraud involved in buying or selling on the basis of inside information is based first on the user's relationship with the corporation being such as to allow him access to information intended only for a corporate purpose—not for his personal benefit. For the instant, we shall assume this to have been met.[5] Secondly, the fraud rests " * * * upon the inherent unfairness involved where a party takes advantage of such information knowing it is unavailable to those with whom he is dealing." Cady, Roberts & Co., 40 S.E.C. 907, 912 (1961). Where, as plaintiff alleges here, *both* parties had full knowledge, there is no fraud upon either party resulting from the use of this knowledge.

 Accordingly, we find no cause of action asserted against Paribas. No authority has ever suggested that two parties, both having information unknown to the world at large, cannot deal with each other. The cases are to the contrary. See Kohler v. Kohler Co., 319 F.2d 634 (7th Cir. 1963); Nemitz v. Cunny, 221 F.Supp. 571, 575 (N.D.Ill.1963).

The rule does not impose a general obligation to publicly disclose all business secrets, when sound practice indicates discretion. See Fleischer, Securities Trading and Corporate Practices: The Implications of The Texas Gulf Sulphur Proceedings, 51 Virg.L.Rev. 1271, 1304 (1965). To hold otherwise would effectively bar an arms-length transaction between a corporation needing funds to develop a "secret" discovery and an investor whose very incentive to invest stems from his knowledge of the corporate secret.

### The Aquitaine Purchase

We regard the Aquitaine purchase as being more troublesome. Aquitaine's position as Banff's controlling shareholder and its direct representation on Banff's Board of Directors gives flash credence to plaintiff's innuendoes of a fraudulent scheme.

 The "fraud" charged here, however, cannot rest on the use of inside information, for all parties knew all material facts. However, a breach of fiduciary duty is alleged. Although perhaps actionable under state corporate law, we are disinclined to hold this as stating a cause of action under section 10(b).

 There is general agreement that not every breach of a fiduciary obligation imposed by state law is also a *violation* of section 10(b). Note, 50 Cornell L.Q. 545, 546–47 (1965); Fleischer, "Federal Corporation Law": An Assessment, 78 Harv.L.Rev. 1146, 1166 (1965). The import of two recent cases in our circuit indicates that the violation of a fiduciary duty does not constitute a cause of action under section 10(b) and Rule 10b–5 absent any affirmative misrepresentation or breach of an affirmative duty to disclose.

In Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964), the court held that the complaint stated a cause of action under section 10(b) where it was alleged that as part of a scheme to perpetuate control, treasury shares were issued to a director at an arbitrarily low price and that information as to the latest financial statement of the corporation was purposefully withheld from

5. Acquitaine, as the controlling share holder of Banff, is held to the same standard of fiduciary duty as a director. Cochran v. Channing Corp., 211 F.Supp. 239, 242 (S.D.N.Y.1962). Paribas' position is that of "tippee." See Cady, Roberts & Co., supra; Painter, Inside Information: Growing Pains for the Development of Federal Corporation Law Under Rule 10b–5, 65 Colum.L.Rev. 1361, 1385–1390 (1965).

some directors. In O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964) the court affirmed the dismissal of the complaint where it alleged that the Board of Directors, as part of a scheme to perpetuate control, approved a stock swap at a ratio unfavorable to the corporation. The crucial distinction between the cases is the absence in *Maytag* of deceit of any kind, affirmative misrepresentation or failure to disclose, on the decision-making body.

The *Maytag* court stated:

"* * * where the duty allegedly breached is only the general duty existing among corporate officers, directors and shareholders, no cause of action is stated under Rule 10b–5 unless there is an allegation of facts amounting to a deception.

Our conclusion follows from our view of the purpose of § 10(b): "[T]hat section was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs." Birnbaum v. Newport Steel Corp., 193 F.2d 461, 464 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). O'Neill v. Maytag, supra, at 768.[6]

■ At best, the facts alleged here support a charge of fraudulent mismanagement of corporate affairs. The absence of any deception limits the analogy to traditional common law fraud upon which section 10(b) is based. See Note, supra, 50 Cornell L.Q. at 547; Fleischer,

supra, 78 Harv.L.Rev. at 1166. The misappropriation or waste of corporate assets, also present in *Maytag*, is not the fraud to which section 10(b) was directed. See also Carliner v. Fair Lanes, Inc., 244 F.Supp. 25 (D.Md.1965). Plaintiff, accordingly, can receive no support from the language of the *Ruckle* court that all the directors can defraud their corporation, when the "fraud" complained of is not "fraud" within the meaning of section 10(b).[7]

### Other Sections Invoked

■ We find no cause of action alleged under section 9(a) (4)[8] of the Exchange Act. There has been no assertion of misrepresentation by the purchaser to the seller. See Elfenbein v. Yaeger, CCH Fed.Sec.L.Rep. ¶ 91368 (S.D.N.Y.1964).

■ No cause of action under sections 12(2)[9] and 17[10] of the Securities Act has been pleaded. These sections, imposing liability on the seller of the security, create a cause of action only in a defrauded purchaser. Slavin v. Germantown Fire Ins. Co., supra; Birnbaum v. Newport Steel Corp., supra. Neither the corporation nor plaintiff are purchasers of securities.

### Discovery

Plaintiff urges that we grant him full discovery before proceeding to summary judgment against him. We deny this request.

■ We note at the outset plaintiff's failure to comply with the procedure directed by Rule 56(f). Moreover, disregarding form, we find that the "facts"

---

6. Compare the observation of the *Ruckle* court: "It may be that there was no concealment of material facts at the board of directors meeting at which the transactions was approved." This, the court stated, went to the merits of the case. Ruckle v. Roto American Corp., supra, 339 F.2d at 29.

7. But see Heilbrunn v. Hanover Equities Corp., supra, where the court said: "* * * it is clear that the corporation, as seller of stock and claimant in the third count, may be defrauded by all

of its directors, and is not barred from relief by the notion of imputed knowledge." However, the complaint there charged definite affirmative misrepresentations were made. The court held that the causal connection between the misrepresentations and the wrong to the corporation was a matter of proof at trial.

8. 15 U.S.C. § 78i(a) (4).

9. 15 U.S.C. § 77*l*(2).

10. 15 U.S.C. § 77q.

plaintiff wishes to discover are irrelevant to the grounds of this decision.

Extracting to the utmost in plaintiff's favor, we discern no merit in prolonging this suit.

Summary judgment for the defendants so moving is directed.

This shall be considered an order; settlement thereof is unnecessary.

So ordered.