John A. CABLE, Plaintiff,

v.

Ira J. HECHLER et alia, Defendants.

No. CV–80–1365.

United States District Court,
E. D. New York.

Sept. 8, 1981.

Leaf, Deull, Drogin & Kramer, New York City by Martin N. Leaf, Jeffrey C. Miller, New York City, for plaintiff.

Barrett, Smith, Schapiro, Simon & Armstrong, New York City by Warren Colodner, New York City, for defendant Ira J. Hechler.

Weil, Gotschall & Manges, New York City by Dennis Block, New York City, for defendant Oppenheimer & Co.

Finkelstein, Thompson & Levenson, Washington, D. C., and Bressler, Lipsitz & Rothenberg, New York City by Burton Finkelstein, Washington, D. C., David Olesker, New York City, for defendant Murray Hirsch.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

Plaintiff, John Cable, has brought this action complaining of alleged violations of sections 10 and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and 78t; Rule 10b–5, promulgated thereunder, 17 C.F.R. § 240.10b–5; and the common law. Defendants, Hechler, Oppenheimer, and Hirsch, have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure or, alternatively, pursuant to Rule 56(b). Defendant Hechler also seeks costs and attorneys' fees.

Plaintiff has responded with a cross-motion seeking leave to amend the complaint. That motion has been granted, and an amended complaint has been filed. Defendants' motions, now addressed to the amended complaint, remain to be resolved.

Considering defendant's motions as motions pursuant to Rule 12, the material facts alleged by plaintiff must be taken as true. *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976); *Texas Consumer Finance Corp. v. First National City Bank*, 365 F.Supp. 427, 429 (S.D.N.Y.1973). Plaintiff alleges that as of May 1977 he was the Chairman of the Board and Chief Executive Officer of Spartek, Inc., a corporation en-

gaged in the manufacture and sale of engineered building and industrial products, primarily products made of ceramic tile. From May 1977 through March 31, 1979, he owned shares of common stock of Spartek, the shares of which were publicly traded on the American Stock Exchange ("AMEX"). In May 1977 and at all other times relevant to the issues raised here, defendant Hechler was the Director of Acquisitions for defendant Oppenheimer.

In May 1977, defendant Hechler contacted Spartek through plaintiff and proposed that a group, including Oppenheimer and Hechler, acquire Spartek's name, business, and substantially all of its assets. The transaction further contemplated that Spartek would become a closed-end diversified investment company (SPR Fund, Inc.), which, using part of the cash obtained from the sale of assets, would offer to purchase all issued and outstanding shares of Spartek stock from those who did not wish to continue their investment in the new business.

Hechler and Cable negotiated concerning the terms of this transaction from May 1977 until October 22, 1977, when plaintiff terminated all discussions because he believed negotiations had reached an impasse. Throughout this period and afterward, until December 1977, Hechler is, at the same time, said to have traded, without plaintiff's knowledge, in Spartek stock. Hechler is also said to have informed defendant Hirsch and others of the existence and status of the negotiations with Spartek; and they, on the basis of this information, in conjunction with Hechler, are said to have also traded in Spartek stock from June through December 1977.

Prior to the commencement of the negotiations, Hechler is said to have assured plaintiff Cable that the existence, status, and terms of the proposed transaction would be revealed only to the proposed purchasers and to no others and would not be exploited by Hechler, directly or indirectly, for private gain.

From November 11 through 13, 1977, there is alleged to have been an unusually high volume of trading in Spartek stock, said to be directly attributable to trading by defendants Hechler and Hirsch and others who were given inside information about Spartek by Hechler. On November 14, 1977, an AMEX listing representative asked plaintiff if he knew why there was such a high volume of trading. Plaintiff said he did not know the cause.

On December 5, 1977, Hechler informed plaintiff that Spartek's demands would be met; and on December 6 and 7, 1977, Spartek issued press releases describing the general terms of the proposed sale. Thereafter, between December 12, 1977, and February 2, 1978, Hechler and Hirsch are said to have sold all of their shares of Spartek stock. In July 1978, the parties reached a definitive agreement of sale which provided for closing, subject to shareholder approval, on August 31, 1978, or, at the latest, October 31, 1978.

Spartek then filed a preliminary draft of a proxy statement with respect to the sale with the Securities Exchange Commission. At this time the Commission is said to have been engaged in an investigation of defendants Hechler, Hirsch, and Oppenheimer for insider trading by them, occurring between 1975 and 1978, in the stock of corporations with respect to which Hechler was, at the time of the trading, negotiating sale-of-assets transactions. The Commission's investigation resulted in the filing of a federal court action against Hechler and Hirsch and an administrative proceeding against Oppenheimer. These actions in turn resulted, after the events material to this action, in a consent judgment against defendants Hechler and Hirsch containing a plan of disgorgement and a settlement with defendant Oppenheimer containing a plan for supervising defendant Hechler. In connection with this judgment, the defendants stated that they neither admitted nor denied the charges against them.

In the context of its investigation of Hechler, Hirsch, and Oppenheimer, the Commission undertook an informal investigation of the proposed sale which delayed the processing of Spartek's Proxy Statement and, thus, the shareholder meeting. That inves-

tigation culminated in Spartek's and plaintiff's consent to the entry of an Order and Findings and the issuance of a Report of Investigation. The Commission found, *inter alia*, that plaintiff had lied to the AMEX representative when he said he didn't know the cause of the unusually high trading. This finding was widely reported, allegedly damaging plaintiff's name and reputation.

On October 6, 1978, Oppenheimer and Hechler withdrew from participation in the sale, but new financial backing was found, and the contract of sale was amended on November 9, 1978, to provide for closing by March 31, 1979. On November 14, 1978, Cable says he learned for the first time of Hechler's insider trading and tipping. On February 22, 1979, a report was released finding the proposed sale favorable to the public shareholders. The sale was consummated on March 31, 1979. Plaintiff ceased to be a shareholder of Spartek and became a shareholder of SPR Fund, Inc.[1]

Plaintiff alleges that, as a result of defendants' wrongdoing, he was damaged in that "[i]t was an integral part of the sale that, upon closing, SPR, as a regulated investment company under the Internal Revenue Code, would distribute 90% of its net income directly to its shareholders in cash ... which I would have received if not for the wrongful acts of defendants. That money is now irretrievably lost." (Plaintiff's Affidavit, dated 8/29/80, ¶ 19[b] ) Plaintiff also states that "[t]he fact and circumstances of the seven months' delay entailed a loss of benefits and necessitated personal out-of-pocket expenditures all of which aggregated $260,000." (Plaintiff's Affidavit, dated 8/29/80, ¶ 18).[2]

Plaintiff's claim essentially is that the transaction was delayed due to defendants' acts, as, therefore, was plaintiff's receipt of the economic benefits of the transaction which he was to receive. Defendants' acts are said to have constituted a fraud not only upon third persons who bought from defendants in their insider trading, but also upon the plaintiff because he had been assured by defendant Hechler that the negotiations would be kept confidential.

The fraud alleged concededly ended by November 14, 1978. On that date the plaintiff became aware of defendants' activities. Since, as plaintiff correctly states, an action for fraud requires a showing that plaintiff reasonably relied on a misrepresentation to his injury, it seems important to examine what had occurred by November 14, 1978, and what, if anything, remained to be done to complete the transaction. Plaintiff alleges that there had been, prior to November 1978, extensive negotiations between himself and defendants and that an agreement of sale, subject to shareholder approval, had been signed. Plaintiff also alleges that he personally was, at that point and in fact from the date of the public announcement in December 1977, "locked into" the sale and into his commitment to become a shareholder of SPR. Plaintiff states in this connection:

First, I do not think I exaggerate when I say that my commitment to becoming a shareholder in SPR rather than tendering my Spartek shares for cash, was in itself an integral element of the Sale, one of its very premises. Second, when I learned of Hechler's fraud, the damage which the fraud had caused had been accomplished.... Third, if I 'personally' disaffirmed the sale or recommended against it in my 'individual capacity' and the sale was turned down by Spartek's shareholders, I doubt whether Sparco or the courts would have excused me or Spartek of a breach of the purchase agreement between Spartek and Sparco. Also, I believe that the Commission would have

---

1. The transaction in its essential elements provided that Spartek would sell all of its assets to what was initially defendants' company, Sparco Operating, Inc., for cash. Spartek would then change its name to SPR Fund, Inc., change its business from manufacturing to that of an investment company, and offer to purchase all of its outstanding shares. Those who refused this offer, such as the plaintiff, would thus own stock in SPR Fund, Inc.

2. Plaintiff also alleges damages to reputation which will be considered separately, *infra*.

looked askance at my 'individual' choice. . . . (Plaintiff's Affidavit, dated 9/24/80, ¶ 8)

■ Plaintiff's assertion that he personally was "locked into" the transaction as of the date he learned of the fraud, is, however, unconvincing. His allegation in this lawsuit is that he and Spartek were defrauded by representatives of the acquiring company. That fraud, if proved, would seem adequate grounds for a turnabout in plaintiff's personal position both in the eyes of the court and the Securities Exchange Commission. Rescission is one of the traditional remedies for fraud. *See generally* Prosser, *Torts* § 110 (1971).

The corporation, on the other hand, although not "locked into" the transaction, because it too could have sued for rescission on the grounds of fraud, did take some action in reliance upon defendant Hechler's representations.

■ Presumably, had the corporation known that defendant Hechler planned to engage in insider trading and tipping, it might have looked elsewhere for a purchaser for Spartek's assets and consummated the transaction substantially before the date on which it actually was consummated. The corporation and its shareholders would, therefore, have enjoyed the economic benefits of the sale substantially before they actually did. Clearly, however, it is the corporation that was injured by any misrepresentations by defendants, and not plaintiff himself.

The Second Circuit has stated in *Vincel v. White Motor Corporation,* 521 F.2d 1113, 1118 (2d Cir. 1975), that:

"where an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock, only the corporation itself, its receiver, if one has been appointed, or a stockholder suing derivatively may maintain an action against the wrongdoer. The theory is generally that the corporate recovery restores the value of the stock." (Citations omitted.)

■ There are exceptions to this rule, such as where there is a special relationship between a shareholder and the defendant, but no such relationship has been alleged here.[3]

The standards for applying this rule have been expressed in *In Re Penn Central Securities Litigation,* 347 F.Supp. 1324, 1327 (E.D.Pa.1972), where the court stated that:

"[s]hareholders have an interest in the corporation, and therefore any injury to the corporation will affect them. In determining whether an action sets forth a derivative or a direct claim, we must determine whether the corporation or the stockholder was the directly injured party. If the primary duty breached by the defendant is to the corporation, the shareholders, although affected by the wrongdoing, have no individual right of action. *Johnson v. American General Insurance Co.,* 296 F.Supp. 802, 810 (D.C.D. C.1969) . . . . As has been well said, 'any other rule would admit of as many suits against the wrongdoer as there were stockholders in the corporation.' If damages to a stockholder result indirectly, as

---

**3.** Plaintiff states in his complaint that during the negotiations "Hechler freely and voluntarily offered plaintiff and his associates advice connected with the structuring of the sale and the most appropriate way to present its terms to Spartek's public shareholders and to the Commission. Hechler capitalized on his reputation as an originator of and expert in sale-of-assets transactions such as the sale so as to create in plaintiff an attitude of dependence on his and Oppenheimer's expertise and judgment." (Complaint ¶ 23) This allegation may be read to establish a general dependence by both the corporation and stockholders on Hechler's expertise, but it is not the kind of relationship of trust distinctly owed to the shareholder found by the courts to be sufficient to establish a separate cause of action for individual shareholders. *See, e.g., Matter of Auditore,* 249 N.Y. 335, 164 N.E. 242 (1928) (wrongdoer who looted a corporation, some of the stock of which was owned by his deceased brother's estate, was the administrator of the estate and hence liable to the estate in that capacity rather than in his capacity as officer and director of the corporation). *Cutler v. Fitch,* 231 App.Div. 8, 246 N.Y.S. 28 (4th Dep't 1930) (wrongdoers charged with mismanagement were pledgees of plaintiff's stock).

the result of an injury to the corporation, and not directly, he cannot sue as an individual." 13 W. Fletcher, *Corporations* § 5911 (1970).

Here, the plaintiff was negotiating a contract on behalf of the corporation when it and he, as the corporation's representative, were defrauded. In these circumstances, the primary remedy for breach of contract lies with the principal, *see generally* 3 N.Y. Jur.2d, *Agency* § 272 (1980), and Hechler's principal duty was to the corporation. Furthermore, the injury to Cable was no different than the injury to any other shareholder. He was damaged, as was every other stockholder, only because the corporation was damaged.

■ The same sequence of events may also be analyzed in terms of causation. As noted above, one of the elements of a common law action for fraud is the requirement that the plaintiff rely on the misrepresentation. As Prosser states: "[T]he causal connection between the wrongful conduct and the resulting damage, essential throughout the law of torts, takes in cases of misrepresentation the form of inducement of the plaintiff to act, or to refrain from acting, to his detriment." Prosser *Torts*, § 108 (1971).

■ In the instant case there has been no allegation that the plaintiff, individually, acted or refrained from acting because of Hechler's misrepresentations. The only actions he alleges he took or failed to take were in his corporate capacity. As an individual stockholder, which is the capacity in which he has brought this suit, plaintiff neither acted nor refrained from acting. He did not sell his shares or buy more, nor does he allege that he refrained from selling and investing his money elsewhere because he anticipated realizing the economic benefits of this transaction several months before he actually received them. Rather, it was the corporation which relied on defendants' false assurances and was injured. Thus, the remedy lies with the corporation.

■ The analysis offered above applies with equal force to plaintiff's common law fraud and his claim under § 10(b) and Rule

10b–5. The fact that the injury was a result of a violation of federal securities law does not change the rule that only a corporation can sue for injury to the corporation. *See Schoenbaum v. Firstbrook*, 268 F.Supp. 385, 390 (S.D.N.Y.1967), *aff'd*, 405 F.2d 200 (2d Cir.), *aff'd in part, rev'd in part on other grounds, en banc*, 405 F.2d 215 (2d Cir. 1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). In *Surowitz v. Hilton Hotels Corp.*, 342 F.2d 596, 604 (7th Cir. 1965), *rev'd on other grounds*, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966), the Court stated: "Where it has appeared that a corporation was the party injured by a violation of Section 10(b) of the 1934 Act, the courts have held that a shareholder of that corporation has standing to sue only on a derivative basis." [Quoted with approval in *Vanderboom v. Sexton*, 422 F.2d 1233, 1243 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970).]

The requirement that plaintiff establish causation also applies in 10b–5 actions. The Second Circuit has stated: "We consistently have held that causation is a necessary element of a private action for damages under Rule 10b–5." *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 238 (2d Cir. 1974). *See also Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88 (2d Cir. 1981). This has been refined further in *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), to require—

"a showing of both *loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the [plaintiff] to engage in the transaction in question. . . . In a misrepresentation case, to show transaction causation a plaintiff must demonstrate that he relied on the misrepresentations in question when he entered into the transaction which caused him harm. In an omission or nondisclosure case based upon Rule 10b–5, a plaintiff need not show reliance in order to show trans-

action causation but must still show that the facts in questions were material 'in the sense that a reasonable investigator might have considered them important' in making his investment decisions. *Affiliated Ute Citizens v. United States* 406 U.S. 128, 153–54 [92 S.Ct. 1456, 1472, 31 L.Ed.2d 741]." *Id.* at 380–81 (footnote and citations omitted).

Here, plaintiff has not alleged that he made any investment decision in connection with which defendants' concealment was material, but only that a corporate decision was made.

The holding that plaintiff needs to have made an investment rather than a corporate decision in order to bring suit is buttressed in this context by the fact that "[t]he Securities Act was designed primarily to protect investors by 'promoting full disclosure of information thought necessary to informed investment decisions.'" *Vanderboom v. Sexton, supra*, 422 F.2d at 1243, *quoting SEC v. Ralston Purina Co.*, 346 U.S. 119, 124, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953). And although not directly applicable to plaintiff's claim here, the Supreme Court's holding in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), lends support to the proposition that only those who were actually caused to make an investment decision by a violation of the securities laws may bring a private action to recover damages.

The second element of damages claimed by plaintiff is injury to reputation. His claim is that defendants' fraud produced an unusually high volume of trading which resulted in an inquiry from an AMEX representative. In response to the inquiry, plaintiff stated that he knew of no reason for the recent large volume of trading and, when asked if Spartek was involved in negotiations to sell its assets, responded, he says truthfully, that it was not because he believed the negotiations of which he was aware had reached an impasse a few weeks before. The SEC then found wrongfully, plaintiff alleges, that the plaintiff had lied, thus causing damage to plaintiff's reputation.

■ This part of plaintiff's suit is barred for two reasons. First, "[i]t has been held that recovery cannot be had in an action for deceit for ... public disgrace incurred through being deceived by false representations...." 37 C.J.S. *Fraud* § 141(f) (1943) at p. 469, *citing Cable v. Bowlus*, 21 Ohio C.C. 53, 11 Ohio Cir.Dec. 526, *aff'd*, 69 Ohio St. 563, 70 N.E. 1115 (1903); *see Moore v. Slonim*, 426 F.Supp. 524, 527 (D.Conn.), *aff'd*, 562 F.2d 38 (2d Cir. 1977) ("it is black letter law that damages for mental distress are not ordinarily available in a cause of action for business fraud").

Second, "[i]t is essential to the maintenance of an action for fraud that damages result from it as the proximate cause.... The damages must be such as are the natural and probable consequences of the defrauder's acts." 24 N.Y.Jur. *Fraud and Deceit* § 196 (1962) at 273–74. Another authority has stated that the injury will be considered to have been proximately caused if "the party guilty of the fraud ought reasonably to have contemplated them" as the probable consequence of his fraud. 37 C.J.S. *Fraud* § 141(b) (1943) at 467.

■ In the instant case I cannot find on the facts as alleged by plaintiff that the injury to his reputation was the proximate consequence of defendants' fraud. Essentially what is alleged is that defendants committed acts which, foreseeably, caused an inquiry to be made by the AMEX. The course which that inquiry thereafter followed with regard to plaintiff was, however, hardly to be expected. It was not, for example, foreseeable that plaintiff would deny all knowledge of the pending negotiations as an explanation of the excessive trading rather than explaining that there had been negotiations, although they had recently come to an impasse. Certainly, plaintiff had little reason to keep these negotiations secret from anyone if they were, as he alleges, over. His decision not to reveal negotiations which had ended less than a month earlier because he deemed them unresponsive to a question about negotiations which might have affected trad-

ing in the stock is, in other words, hardly a response to the AMEX inquiry which could have been reasonably foreseen by the defendants. Furthermore, the allegedly erroneous decision by the SEC that the plaintiff had lied is also an intervening cause not foreseeable by the defendants. *See Moore v. Slonim, supra,* 426 F.Supp. at 527.

In sum, since the damages claimed by plaintiff are not recoverable under either the federal securities laws or a common law action for fraud upon the facts as alleged by plaintiff and since all of plaintiff's claims are predicated upon the existence of all of those causes of action, defendants' motions to dismiss are granted.

Defendant Hechler's motion for costs and disbursements, including attorneys' fees, is denied. I cannot find that this action, which arises from a somewhat unsettled area of the law, was brought in bad faith, vexatiously, wantonly or for oppressive reasons, as claimed by defendant Hechler.